In re James Robert ROBUSTELLI, Debtor.

Lou Robustelli Marketing Services, Inc., Plaintiff,

v.

James Robert Robustelli, Defendant.

Bankruptcy No. 08–71343–PWB.
Adversary No. 08–06513.

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

April 6, 2010.

Stephen T. LaBriola, Steven M. Kushner, Fellows LaBriola LLP, Atlanta, GA, for Plaintiff.

Chris D. Phillips, G. Frank Nason, IV, Lamberth, Cifelli, Stokes, Ellis & Nason, Atlanta, GA, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PAUL W. BONAPFEL, Bankruptcy Judge.

### I. Nature of the Proceeding and Procedural Background

#### A. Introduction

This adversary proceeding concerns the dischargeability of claims asserted by the Plaintiff, Lou Robustelli Marketing Services, Inc. ("LRMS"), whose shareholders are Lucian Robustelli ("Lou") and his wife, Helen, against their son, the Debtor and Defendant, James Robustelli ("Jim"). LRMS's business involved the solicitation of corporate clients to use sporting events, including the Super Bowl, the U.S. Open Tennis Tournament, college football games, and the Masters Tournament in

Augusta, Georgia, as marketing tools for their businesses. Its main program and largest source of revenue was marketing corporate events and promotions around the Masters Tournament.[1]

The claims arise out of Jim's management of the corporation and operation of its sports event marketing business as its president prior to his resignation on October 24, 1997 and his formation of a new company, Robustelli Sports & Events Marketing, Inc. ("RSEM"), to engage in the same type of business. Jim's resignation followed unsuccessful negotiations between father and son regarding the sale of the business to Jim, who had no ownership interest.[2] Jim's wife, Sandra Robustelli, who had provided bookkeeping and clerical services for LRMS, became a shareholder, officer, and director of RSEM.

At the time of his resignation, Jim was (and had been for several years) responsible for LRMS's day to day operations, including the solicitation of clients, preparation of contracts with clients, arranging events, programs, and housing accommodations, and securing tickets for the sports events. Jim's new company eventually did business with many of the clients of LRMS, which did not conduct business operations following Jim's resignation.

In June 2001, LRMS filed a complaint in the State Court of Fulton County against Jim, Sandra, and RSEM asserting a number of claims against them. After a four day jury trial in January 2006, the jury returned a verdict[3] in favor of LRMS against Jim and Sandra for $31,653 for breach of fiduciary duty, $12,650.30 for

---

1. Admitted allegations of complaint [Docket No. 1] ¶¶ 6–10, 11, 19–20.

2. Admitted allegations of complaint [Docket No. 1] ¶¶ 14–20, 27–28.

3. The verdict is at tab 7 of Volume I of the record in this Court. The text below in Part I(C) explains the contents of the record before the Court for purposes of resolving the issues before the Court.

conversion,[4] and $92,000 in attorney's fees and expenses of litigation. The jury found that RSEM was liable for tortious interference with business relations [5] and that Jim was liable for misappropriation of trade secrets [6] but awarded zero damages on both claims. The jury declined to award punitive damages.[7]

On appeal,[8] the Court of Appeals of Georgia affirmed the verdict against Jim and Sandra on the conversion claim and ruled that the award of zero damages on the claims for tortious interference with business relations and misappropriation of trade secrets was a judgment for the defendants.[9] The Court of Appeals also affirmed the jury verdict with regard to Jim's liability on the breach of fiduciary duty claim but reversed as to Sandra's liability, concluding that she could not be held liable for breach of fiduciary duty because she was not an officer, director, or agent of LRMS.[10] The Court of Appeals vacated the awards of damages for breach of fiduciary duty and attorney's fees because it could not determine "whether these portions of the jury's award were based on the proper claim for Jim's breach of fiduciary duty or the improper one against Sandra." [11] The court remanded "for a new trial limited to the question of damages arising from Jim's breach of fiduciary duty, including fees and punitive damages." [12]

Jim filed his Chapter 7 bankruptcy petition on June 17, 2008,[13] and LRMS timely filed its complaint initiating this adversary proceeding in which it seeks a determination that certain claims against Jim are excepted from discharge under paragraphs (2), (4), and (6) of 11 U.S.C. § 523(a).

## B. Allegations of the Complaint in this Proceeding

Count One of the complaint in this adversary proceeding alleges, "By virtue of [Jim's] misrepresentations and conversion of funds belonging to LRMS, LRMS has suffered damages in an amount not less than $202,000, plus interest." [14] In this claim, LRMS asserts that Jim failed to account for a profit of $202,000 that LRMS made on the 1997 Masters Tournament prior to Jim's resignation.[15] LRMS asserts that Jim's conduct in this regard constituted fraud or defalcation while acting in a fiduciary duty, such that the claim is excepted from discharge under § 523(a)(4), or actual fraud, such that it is excepted under § 523(a)(2)(A). Count Three of the complaint alleges that the

---

4. The parties agreed at the status conference referred to in Part I(C) that the judgment for conversion has been satisfied.

5. LRMS did not assert a tortious interference claim against Jim and Sandra.

6. LRMS did not assert a misappropriation of trade secrets claim against RSEM and Sandra.

7. The jury also found in favor of the defendants on claims under the Georgia Racketeer Influenced and Corrupt Organizations Act.

8. *Lou Robustelli Marketing Services, Inc. v. Robustelli,* 286 Ga.App. 816, 650 S.E.2d 326, 327 (2007) [referred to herein as *Robustelli* ].

9. *Robustelli,* 286 Ga.App. at 818, 650 S.E.2d at 328–29.

10. *Id.* at 820, 650 S.E.2d at 330.

11. *Id.* at 821, 650 S.E.2d at 330. LRMS did not appeal the judgment in favor of the defendants on the Georgia Racketeer Influenced and Corrupt Organizations Act.

12. *Id.*

13. Admitted allegations of complaint [Docket No. 1] ¶ 2.

14. Complaint [Docket No. 1] ¶ 67.

15. Complaint [Docket No. 1] ¶¶ 22–25.

claim is also excepted from discharge under § 523(a)(6) as willful and malicious injury to LRMS's property.

In Count Two, the complaint asserts that Jim's "tortious and fraudulent conduct" constituted a "breach of his fiduciary duties of good faith and loyalty to LRMS" as a result of which he received "money rightly belonging to LRMS, which caused LRMS to suffer damages."[16] Jim breached his fiduciary duties, the complaint continues, "by, among other things, usurping corporate opportunities of LRMS, both prior to and subsequent to his resignation from LRMS."[17] This claim centers on the allegations that, prior to and after Jim's resignation, he "began competing against LRMS for the very clients he recently solicited for LRMS," including contacting all of LRMS's customers on behalf of Jim's competing company, RSEM; that Jim copied and used LRMS's address book, customer lists, other records, and all of LRMS's confidential information; that he took and used LRMS's telephone and facsimile numbers and did not forward calls to LRMS; that he created and used letterhead for his new business that was "deceptively similar" to LRMS's letterhead; and that he withheld information from LRMS, including information regarding solicitation of LRMS's clients for the next year's (1998) Masters Tournament and other Masters-related information such as badge and sources for rental homes.[18]

Count Two alleges that, after his resignation, Jim continued to solicit clients for the 1998 Masters program on behalf of his new company that he had solicited on behalf of LRMS while managing LRMS.[19] Although it is not clear from the complaint, it appears that Count Two asserts claims for breach of fiduciary duty through usurpation of corporate opportunities of LRMS that caused damages in the amount of profits that Jim's new company made on the Masters program for 1998 and subsequent years. The complaint seeks exception from discharge of these claims because they constitute fraud or defalcation under § 523(a)(4) or actual fraud under § 523(a)(2)(A). Count Three asserts that these claims are also excepted from discharge under § 523(a)(6) because they are for willful and malicious injury to LRMS's property.

## C. The Motions for Summary Judgment and Stipulation for Trial on Stipulated Record

Each party filed a motion for summary judgment and briefs in support of the motion and in opposition to the adversary's. The Court granted partial summary judgment in favor of Jim that LRMS's claims are not excepted from discharge under § 523(a)(4),[20] concluding that the general fiduciary duty that Georgia law imposes on a corporate officer does not establish the type of technical trust that is necessary to except a debt from discharge based on fraud or defalcation in a fiduciary capacity

---

16. Complaint [Docket No. 1] ¶ 71.

17. Complaint [Docket No. 1] ¶ 72.

18. Complaint [Docket No. 1] ¶¶ 31–51.

19. Complaint [Docket No. 1] ¶ 29.

20. The Court ruled on the motions for summary judgment in its "Order on Motion for Summary Judgment and Notice of Status and Scheduling Conference," entered on April 8, 2009 [Docket No. 17] (the "Original Summary Judgment Order"). The Court in numerous instances in that Order erroneously referred to the claim of LRMS for profits from the 1997 Masters Tournament programs as the "2007 Masters Profit." The Court corrected this error in an amended order entered contemporaneously herewith [Docket No. 37] (the "Amended Summary Judgment Order").

under § 523(a)(4).[21]

The record before the Court in connection with the motions for summary judgment did not include the charge to the jury or the jury verdict. The Court concluded that, in the absence of this information, it could not determine whether LRMS's claims were excepted from discharge under § 523(a)(6) or § 523(a)(2).

In the course of ruling on the motions for summary judgment, the Court observed:[22]

[T]he Court has struggled to match the claims asserted by the Plaintiff in this proceeding to the claims that were actually tried in the State Court litigation and to the single claim that remains open on remand for determination of damages in accordance with the decision of the Court of Appeals. Although it is quite clear that Jim is liable as a matter of law for breach of fiduciary duty, the Court cannot tell what damages LRMS is entitled to recover under that claim. . . .

For purposes of ruling on the pending motions, the Court will address what appear to be the two principal claims that LRMS asserts are excepted from discharge. One is for the profits from the Masters programs for 1998 and subsequent years, which the Court will refer to as "Future Masters Profits." The second is for the profit of $202,000 from the 1997 Masters program, which the court will refer to as the "1997 Masters Profit."

After setting forth its ruling on the motions for summary judgment, the Court outlined its assessment of the remaining issues to be resolved in this proceeding and scheduled a status and scheduling conference to consider further proceedings.[23] Among other things, the Court solicited the views of the parties as to (1) whether the Court could resolve remaining issues through additional motions for summary judgment based on stipulated facts or a record that included the jury charge, jury verdict, and transcript of proceedings in the State Court litigation; and (2) whether this Court should first determine dischargeability before any further proceedings in the State Court or, alternatively, whether the automatic stay should be lifted to permit litigation in the State Court to determine some or all of the issues other than dischargeability before the Court ruled on dischargeability.[24]

At the status conference, the parties agreed that the Court should determine all issues, other than damages, based on a stipulated record. In accordance with this determination, the Court entered a Scheduling Order that confirms the agreement of the parties "that additional issues remain for the Court's determination regarding Debtor/Defendant's liability to Plaintiff and the dischargeability and that the Court shall make its *de novo* factual determination based on the pleadings to be filed by the parties and the record developed in Fulton County State Court, Civil Action File No. 01–VS–019568–B and the record on appeal to the Georgia Court of Appeals, Case No. A07A0813 and Case No. A07A0868, as stipulated to by the parties."[25] In this regard, the Scheduling Order continues, "The Court will try the

---

21. Amended Summary Judgment Order [Docket No. 37] at 10–11, 19.

22. Amended Summary Judgment Order [Docket No. 37] at 6–7.

23. Original Summary Judgment Order [Docket No. 17] at 21–25.

24. Original Summary Judgment Order [Docket No. 17] at 24.

25. Scheduling Order, entered June 2, 2009 [Docket No. 23] (the "Scheduling Order") at 1–2.

issues in this adversary proceeding as set forth herein on the basis of the stipulated evidence and will render findings of fact and conclusions of law pursuant to Fed. R. Bankr.P. 7052(a) following consideration of such evidence." [26] After prescribing procedures for the submission of the record and a briefing schedule, the Scheduling Order states that, after submission of the record and briefs, "[T]he court shall consider the evidence submitted and the briefs of the parties in making a *de novo* factual determination of the Debtor's liability to Plaintiff for breach of fiduciary duty, including the claim for usurpation of corporate opportunities. This determination shall include whether Plaintiff is entitled to damages (but not the amount of damages that Plaintiff is determined by the Court to be entitled) and whether any such claim for damages is dischargeable under § 523(a)(2) and/or § 523(a)(6)." [27]

### D. Stipulated Record

In accordance with the Scheduling Order, the parties prepared and presented a record that constitutes the evidence before the Court for purposes of resolving the issues in this proceeding. The parties filed notices of filing of the stipulated record, which contain a description of the papers in four volumes submitted on July 2, 2009 [Docket No. 25] and in a supplemental volume submitted on August 3, 2009 [Docket No. 27]. The accompanying footnote generally describes the contents of the volumes. [28] In accordance with the stipulation of the parties and the Scheduling Order, the Court admits all of the documents in these volumes into evidence. The Court generally cites to the exhibits by exhibit number. The Court cites to the transcript of the trial, which is in Volume II, with the letter "T."

The parties have submitted briefs in support of their factual contentions and legal arguments. The accompanying footnotes describes the briefs that LRMS [29] and Jim [30] have filed and the Court's method of citing to them.

### E. Jim's Motion to Compel

Following the submission of the stipulated record and briefs, Jim filed a "Mo-

---

**26.** *Id.* at 2, ¶ 1.

**27.** *Id.* at 3, ¶ 5.

**28.** Volume I consists of pleadings, motions, briefs, and other papers the parties filed in the State Court and in the Court of Appeals of Georgia. This volume includes the following: verdict (7); judgment (8); State Court's order on motions for new trial and j.n.o.v.(14); opinion of Court of Appeals of Georgia (22).

Volume II consists of the trial transcript and excerpts from depositions of Lou and Jim. The charge to the jury is at pages 667–700 of the transcript.

Volume III consists of trial exhibits.

Volume IV consists of documents produced during the state court proceedings.

The Supplemental Stipulated Record consists of additional deposition excerpts and trial exhibits.

**29.** Plaintiff's Motion for Summary Judgment and Plaintiff's Brief in Support of Motion for Summary Judgment ("Plaintiff's Brief")

[Docket No. 26]; Plaintiff's Response to Defendant's Trial Brief and Citation to the Record ("Plaintiff's Response Brief") [Docket No. 29]; Plaintiff's Reply in Support of Motion for Summary Judgment ("Plaintiff's Reply Brief") [Docket No. 31]. Although the title of LRMS's briefs refer to "summary judgment," they are submitted as briefs in accordance with the stipulation and Scheduling Order pursuant to which the Court is to make findings of fact and conclusions of law in lieu of a trial based on the stipulated record.

**30.** Trial Brief and Citation to the Record ("Defendant's Brief") [Docket No. 28]; Defendant's Response to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Pending Motion for Summary Judgment ("Defendant's Response Brief") [Docket No. 30]; Brief in Reply to Response to Defendant's Trial Brief and Citation to the Record ("Defendant's Reply Brief") [Docket No. 32].

tion to Compel," [Docket No. 33], requesting the Court to compel LRMS to specify its damages. The Court dismisses the motion as moot in view of the Court's rulings herein.

### F. Entry of Findings of Fact and Conclusions of Law

The Court has read and carefully considered the record and briefs submitted by the parties. In accordance with the proceedings at the status conference, and as set forth in the Scheduling Order, the Court sets forth below its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, applicable under Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### G. Jurisdiction

This Court has authority to hear and determine this proceeding under 28 U.S.C. § 157(b)(1) as a core proceeding under 28 U.S.C. § 157(b)(2)(I) within the District Court's jurisdiction under 28 U.S.C. § 1334(b) that the District Court has referred under 28 U.S.C. § 157(a) and L.R. 83.7, N.D.Ga. To the extent that this proceeding is not a core proceeding, the Court has authority to hear this proceeding as a proceeding arising in and relating to the bankruptcy case of the Debtor within the District Court's jurisdiction under 28 U.S.C. § 1334(b) that the District Court has referred under 28 U.S.C. § 157(a) and L.R. 83.7, N.D.Ga and authority to determine it, based on the parties' consent to this Court's determination of issues as set forth above, under 28 U.S.C. § 157(c)(2).

### II. Positions of the Parties

The proceedings at the status conference and the briefs of the parties confirm that Counts One and Two of the complaint assert two primary claims for breach of fiduciary that LRMS contends are excepted from discharge. As explained in more detail later, LRMS also appears to assert other claims arising out of Jim's breach of fiduciary duty. Because the principal claims are the largest and require detailed consideration of a number of issues, it is helpful to set out the positions of the parties on the principal claims. The Court explains and considers the positions of the parties with regard to other claims and determines disputes concerning them in Parts IV(C), (E), and (F).

### A. The 1997 Masters Profit

One principal claim is for a profit of $202,000 LRMS allegedly made, while under Jim's management prior to his resignation, from the 1997 Masters program, which the Court refers to as the "1997 Masters Profit." Following the 1997 Masters Tournament, Jim sent a hand-written note to Lou that the company had made a profit of $202,000. LRMS contends that this profit never made its way into LRMS's coffers and that, therefore, Jim must have taken it. LRMS contends that Jim's actions in this regard constituted a breach of his fiduciary duties to LRMS for which Jim has been found liable and that, therefore, LRMS can recover damages in this amount in the retrial in the State Court after remand. The claim for the 1997 Masters Profit is nondischargeable, LRMS asserts, either under § 523(a)(2) because it is the result of Jim's actual fraud or under § 523(a)(6) because such conduct constituted a willful and malicious injury to its property.

Jim also contends that the claim for the 1997 Masters Profit is a claim for conversion and that the judgment on the jury's verdict for conversion, affirmed by the Court of Appeals, precludes LRMS from asserting this claim. On the merits, Jim denies that he took any of the 1997 Masters Profit and that, therefore, he did not

commit fraud or willfully and maliciously damage LRMS's property.

## B. Future Masters Profits

LRMS's second principal claim is for profits made by Jim's new company from the Masters programs for 1998 and subsequent years, which the Court refers to as "Future Masters Profits." LRMS contends that, prior to Jim's resignation, LRMS had existing relationships with clients, ticket sources, and other providers (primarily housing accommodations in Augusta for persons attending the Masters Tournament). When he resigned, Jim copied LRMS's client list, retained the telephone number that LRMS had been using, kept its address book, and used letterhead for his new company that was similar to LRMS's letterhead. Following his resignation, Jim's new company entered into numerous contracts with former LRMS clients for programs for the 1998 Masters Tournament. LRMS claims that Jim thus usurped corporate opportunities of LRMS in violation of his fiduciary duties. LRMS contends that Jim's liability for breach of fiduciary duty, as determined by the Court of Appeals, includes liability for damages for the usurpation of these corporate opportunities and that this liability is excepted from discharge under § 523(a)(2) because it arises from his fraud or under § 523(a)(6) because the usurpation of corporate opportunities constitutes a willful and malicious injury to its property.

Jim contends that no claim for usurpation of corporate opportunities exists, either because LRMS had no contractual commitments with any clients at the time of his resignation or because LRMS did not, after his resignation, have the capability or intent to continue in business. Even if a claim for corporate opportunities exists, Jim argues, the claim is not excepted from discharge because his conduct was not fraudulent and did not constitute willful and malicious injury to LRMS.

## III. Review of Evidence in State Court Proceeding

Before discussing the merits of LRMS's claims and this Court's role in resolving them, the Court summarizes the material evidence in the record from the State Court proceeding. Later parts also discuss evidentiary matters.

In 1978, Lou and his wife Helen started a sports marketing company in Stamford, Connecticut. (T. 333). Prior to starting this business, Lou had several years experience in the sports marketing business, had played professional football, and was a talent scout for the San Diego Chargers for 26 years. (T. 75; Lou Deposition, Vol. I, at 7, 24). The business began as a Connecticut corporation, and operated out of a home office in Lou and Helen's home. (T. 75). The business consisted of the designing and provision of programs around sporting events, including the Super Bowl, the U.S. Open Tennis Tournament, college football games, and the Masters Tournament. (T. 415).

Jim joined the business in 1978 or 1979, shortly after graduating from college. (T. 73). At that time, Lou ran the whole business. (T. 412). He continued to do so until his semiretirement in 1988, after which he solicited no new business for LRMS. (T. 250). By early 1994, Jim had become president of the business (T. 76), and Lou and Helen spent much of their time in California. (T. 415). In 1994, Jim and his wife Sandy moved to Georgia, and the business was reincorporated as a Georgia corporation, all with Lou's approval. (T. 76, 83, 258–59, 415).

At all material times, Jim was the person at LRMS responsible for its day to day operations, including the solicitation of clients for LRMS, the preparation of con-

tracts with clients, arranging the programs and events, and securing tickets for the events. (T. 77–78). Jim maintained all of the books and records of LRMS in his home office, such as correspondence with clients, contracts, invoices, and the only set of computer records. (T. 81). Jim had complete control over LRMS's books and records, including the invoice book and client account ledger (T. 78, 80).

When the business moved to Georgia, LRMS retained an accountant, Dennis Canata, to compile the company's financial statements and to prepare tax returns. (T. 396). Both Jim and Lou participated in the choice of the accountant. The accountant offered to send copies of statements and tax returns to Lou in Connecticut, but he declined. (T. 260, 422, 426).

LRMS's main program, and its biggest source of revenue, was marketing corporate events and promotions around the Masters Tournament. (T. 415). LRMS's programs for the Masters Tournament included arrangements for rental homes; golf tee times at local golf courses; transportation to and from Augusta National, the rental homes, and the golf courses; meals; and tickets to practice rounds and badges to the tournament. (Exhibit 42). Jim considered information relating to such programs to be confidential. (T. 204–05).

In June 1997, after the conclusion of the Masters Tournament program, Jim sent a handwritten note to Lou which stated in its entirety, "Dad, I estimate that we made $202,000 on the Masters. Call with questions." (Jim Deposition, Vol. III, at 22–23; Exhibit 284).[31]

The parties presented extensive evidence at the trial concerning income and expenses with regard to the 1997 Masters program. LRMS introduced some of the company's accounting and financial records (Exhibits 246, 477, 488 [32]) and questioned Jim with regard to some 15 checks drawn on the company account made out to "cash," apparently totalling some $144,095 (T. 178–86), payments to Jim for expenses (T. 110–13), and a $70,000 loan Jim made to the company for expenses during the Masters (T. 113–14, 121–23). Jim testified with regard to accounting for the use of cash to acquire Masters badges and pay other expenses (T. 474–97) and explained why he had made the loan to the company. (T. 497–501).

The trial evidence also consisted of Jim's testimony and numerous documents relating to the company's and Jim's receipts and expenditures of cash that, LRMS contended, resulted in an improper diversion of cash or other benefits from LRMS to Jim. This included documents and testimony regarding personal expenses that the company paid, such as repairs or improvements to Jim's home, where the company had its office, homeowner's and automobile insurance, reimbursement for the use of Jim's van, and other expenses (T. 86–121), Jim's selling tickets to some sports events for his personal account (125–29, 150, 157–77), and Jim's testimony and documents about his deposits of checks for bonuses into his personal account. (T. 91–92).

During the spring of 1997 and continuing through the fall, Lou and Jim discussed the sale of the business, but were unable to reach an agreement. (T. 187–88;

---

**31.** LRMS did not question Jim about this communication when it called Jim for cross-examination as part of its case at the trial in the State Court. The State Court refused to permit questioning about it on cross-examination of Jim after he testified on direct in his case because it was beyond the scope of direct. [T. 535–37].

**32.** Exhibit 488 is in the Supplemental Volume of the record.

Jim Deposition, Vol. III, at 118–28). It is clear that Lou and Jim did not maintain a cordial relationship during or after these negotiations and that a considerable amount of animosity existed between them. (T. 208, 511–12).

Jim sent a letter of resignation to Lou dated October 24, 1997, effective immediately. (T. 189, 228–29; Exhibits 309, 429). In connection with the resignation, he sent a "Status Memo." (T. 208–09; Exhibit 307). The Status Memo discusses administrative matters such as a receivable due from a customer, completion of a Super Bowl program that apparently did not involve any significant work, the fact that all bills had been paid, arrangements for changing the signatory on the checking account, a refund check for postage, and a listing of equipment that LRMS owned, which Jim offered to purchase. The Status Memo did not contain any information about pending contacts or solicitations for the 1998 Masters or other programs. (T. 208–09; Exhibit 307). The equipment was returned to Lou. (T. 308–09).

After Jim resigned, Lou came to Atlanta to review LRMS's books and records, left with three boxes of records (including invoice and payment records), and directed that the rest of them be delivered to him in Connecticut. Lou acknowledged that he could have taken any records he wanted. (T. 311–12). Lou also testified, however, that Jim refused to provide essential information about the 1998 Masters program despite repeated requests (T. 239, 296), including a written one dated November 10, 1997. This writing included a request for a substantial amount of documents and information relating to the company generally and to the Masters program in particular, such as lists of home owners and badge and practice ticket suppliers. (Exhibit 312; T. 233).

Jim testified that, upon his resignation, he turned over the invoice book, the company ledger, writings relating to communications with clients such as correspondence, contracts, and invoices, and computer records to Lou. (T. 81, 94). He acknowledged that he did not provide a written response to Lou's November 10 letter, but testified that he had already provided all of the information he requested. (T. 233).

Jim's new business used the same telephone number that LRMS used, which rang in Jim's basement. (T. 72, 217). Jim also retained LRMS's address book and copied it, the customer list, and other corporate records. (T. 131–32, 203, 216–17). Jim testified that he provided information about LRMS's current customers to Lou by telephone (T. 200–03, 210–11, 232–33), and that client contact information was in records that Jim delivered to Lou. (T. 230).

Jim contacted LRMS's customers, announced his new business, and began soliciting LRMS's clients for the 1998 Masters program and other business. (T. 216–17). LRMS introduced evidence that RSEM, Jim's new company, received $1,000,000 in revenues from former clients of LRMS, and that Jim had solicited some of them for LRMS while in its employ.[33] The evidence does not, however, show that any such client executed a contract with LRMS. (T.516). In this regard, Jim testified, "You have to resell a program every single year along with reselling yourself." (T. 516).

According to Jim's testimony, Lou told Jim at the time of his resignation that Lou was closing the company. (T. 231–32), and LRMS did not conduct any business after Jim resigned. Lou did not contact any clients of LRMS. He sent letters to the

---

**33.** See Plaintiff's brief [Docket No. 26] at 7–16.

Georgia Secretary of State that LRMS had been dissolved and that it would no longer maintain a place of business in Georgia. (T. 304–05) and to the Georgia Department of Labor that LRMS was not doing business. (T. 321–22).

Lou testified that he was capable of continuing LRMS's business and would have done so if Jim had not withheld information from him. Thus, Lou testified that he had to close the business "[b]ecause when [Jim] resigned, he took the business with him, and he never identified to me who his clients were." (T.290–293). Given the state of his health and the absence of the customer list, Lou explained, he could not continue the business in those circumstances. (T.293). But with the necessary information, he testified, he would have been able to find a way to continue LRMS's business. (T. 299).

Lou's wife testified somewhat equivocally on this issue. She repeated that Lou was capable of working and could have taken the clients if LRMS had had them, but acknowledged that, in her deposition, she had testified that, if Jim had resigned and gone to work for General Motors, LRMS would have been dissolved. (T. 364). Further, she testified that LRMS would not have pursued other customers and that, in fact, no effort had been made after Jim's resignation to secure contracts in the business Jim had. She added, "Jim already had the customers. He already had our business. He had the customers. So there was really not much we could do. Even though Lou could have. He was capable." (T. 365).

## IV. Discussion

As outlined in Part II above, the two primary claims against Jim for breach of fiduciary duty that LRMS asserts in this adversary proceeding are excepted from discharge are for the 1997 Masters Profit and the Future Masters Profit. Jim contends that neither claim exists.

With regard to the claim for the 1997 Masters Profit, Jim contends that the claim is for conversion and that the jury verdict, affirmed by the Court of Appeals, resolved the question of his liability for conversion. With regard to the claim for Future Masters Profits that LRMS contends it is entitled to recover as damages based on Jim's breach of fiduciary duty through usurpation of corporate opportunities, Jim asserts that LRMS cannot recover either because LRMS had no corporate opportunities at the time of his resignation or because, in any event, LRMS lacked the capacity or inclination to pursue any opportunities that it had.

In addition to its two primary claims, LRMS may have other claims based on Jim's breach of fiduciary duty. In this regard, the opinion of the Court of Appeals states that Jim's misappropriation of funds, retention of the company's telephone number and address book, and copying of its client list supported the jury's verdict of Jim's liability for breach of fiduciary duty and conversion. LRMS could, and apparently did, seek damages that could be for breach of fiduciary duty other than the 1997 Masters Profit and the Future Masters Profits based on the conduct that the opinion references.

The threshold question with regard to all of these issues is what claims for damages LRMS is entitled to seek in the State Court on remand from the Court of Appeals. Simply stated, the question for the State Court on remand is what Jim did that constituted a breach of fiduciary duty and that gives rise to a claim for damages. In accordance with the stipulation of the parties and the Scheduling Order, this Court now has the task of making that determination based on the prior proceedings in the State Court and the Court of

Appeals from the evidentiary record now before the Court in connection with its determination of what claims of LRMS are excepted from discharge.

## A. Analysis of the Trial Court's Task on Remand

Analysis of the trial court's task on remand with regard to these issues begins with an examination of the jury verdict and the opinion of the Court of Appeals.

The jury verdict[34] found that Jim and Sandra were liable for conversion and for breach of fiduciary duty. The jury thus distinguished between damages for conversion and for breach of fiduciary duty, awarding damages of $12,650.30 for conversion and $31,650 for breach of fiduciary duty.[35] The State Court judge, without discussion, denied post-trial motions that the parties filed,[36] which this Court interprets as a ruling that, all things considered, taken as a whole, the evidence authorized the verdicts. Thus, the State Court's ruling did not address the critical question that must now be answered: What specific conduct constituted a breach of fiduciary duty?

The Court of Appeals affirmed the verdict in all respects with regard to conversion.[37] With regard to the breach of fiduciary duty claim, however, it affirmed only with regard to liability and remanded for a determination of damages. Although it is clear that the Court of Appeals ruled that Jim breached his fiduciary duty, it did not specify what Jim did that constituted a breach of fiduciary duty for which damages could legally be recovered. Indeed, the Court of Appeals did not separately describe what evidence supported the conversion verdict as opposed to what evidence supported the breach of fiduciary duty. And the evidence that the Court of Appeals said supported liability for both conversion and breach of fiduciary duty was that "Jim, the president of LRMS, not only retained its telephone number and address book and copied its client list for use in his new venture, but also ordered and participated in the taking of company funds in March 1997, months before his resignation."[38] In this regard, the Court of Appeals noted that the evidence supported the conclusion that "Jim and Sandra converted over $140,000 of [LRMS's] funds for their own use while employed by the company."[39]

Notably, the opinion does not discuss or mention "corporate opportunities;" its only reference to "opportunity" occurs in its quotation of O.C.G.A. § 14–2–831(a)(1). The opinion then devotes one paragraph after quotation of this statute to the law relating to a corporate employee's rights to make arrangements to compete while employed and to compete immediately upon termination of employment. In this paragraph, the opinion quotes from an earlier ruling in another case that a j.n.o.v. in favor of a corporate employee is proper in the absence of evidence that the client list was confidential. Rather than distinguish

---

34. The verdict is at tab 7 of Volume I of the record.

35. The parties in their briefs have not addressed the basis for the amounts that the jury awarded. After careful and extensive study of the evidence, the closing arguments, the jury charge, and the jury verdict, this Court has been unable to discern how the jury arrived at these numbers.

36. The order denying the motions is at tab 14 of Volume I of the record.

37. *Lou Robustelli Marketing Services, Inc. v. Robustelli*, 286 Ga.App. 816, 650 S.E.2d 326 (2007) [referred to herein as *Robustelli* ].

38. *Id.* at 819–20, 650 S.E.2d at 330.

39. *Id.* at 819, 650 S.E.2d at 329.

Jim's case because of evidence that LRMS's client list was confidential, the opinion in the next sentence held that the facts supporting the verdict as to Jim's breach of fiduciary duty and conversion was, as stated above, his retention of the telephone number and address book, the copying of the client list, and the taking of company funds.

The opinion concludes the discussion of Jim's liability with citation of two cases upholding jury verdicts involving claims of both conversion and breach of fiduciary duty. One of these cases observes that a claim to recover converted funds may rest on a claim for breach of fiduciary duty,[40] and the other notes that the party was not subjected to double liability under the facts presented there.[41] They do not appear to address the issues Jim raises concerning whether usurpation occurred.

After determining that Sandra could not be liable for breach of fiduciary duty because she was not an officer of LRMS, the Court of Appeals considered Jim's and Sandra's contention that the evidence did not authorize the damages the jury had awarded. The Court of Appeals affirmed the award of damages for conversion but reversed the award of damages for breach of fiduciary duty because it could not determine whether the damages "were based on the proper claim for Jim's breach of fiduciary duty or the improper one against Sandra."[42] In this regard, it is noteworthy that LRMS did not challenge the sufficiency of these verdicts in its appeal. Thus, the Court of Appeals was not considering the question of whether the damages awarded for breach of fiduciary duty were insufficient. Rather, it was concerned that the award included damages against Jim for which he might not be liable.

As with the State Court's ruling on post-trial motions, the opinion of the Court of Appeals did not expressly address the critical question of what Jim did that constituted a breach of his fiduciary duties and what damages flow from that conduct. The ruling of the Court of Appeals was that Jim was liable for conversion in the amount of $12,650.30 and that he was liable for damages for breach of fiduciary duty in an amount to be determined at a new trial on remand. This Court interprets the opinion of the Court of Appeals as leaving to the State Court, on remand, the task of determining what claims for damages for breach of fiduciary duty remain legally cognizable given the affirmance of the verdict for conversion. Again, under the stipulation of the parties and the Scheduling Order, that task now falls to this Court.

## B. The Claim for the 1997 Masters Profit

The Court first considers whether LRMS may recover on its claim for the

40. *Telcom Cost Consulting v. Warren*, 275 Ga. App. 830, 834–35, 621 S.E.2d 864 (2005). The rulings in divisions two and three of the opinion to which the opinion refers were that a shareholder could prosecute a claim for usurpation of corporate opportunities in a derivative action and that the evidence sustained the verdict on a breach of fiduciary duty theory such that it was not necessary to consider whether damages were also recoverable for conversion. *Id.* at 834–35, 621 S.E.2d at 868.

41. *Multimedia Technologies v. Wilding*, 262 Ga.App. 576, 580, 586 S.E.2d 74, 78 (2003). The ruling in division 2(a) to which the opinion refers was that the trial court did not err in denying a motion for j.n.o.v. on a conversion claim for the transfer of funds on the theory that the evidence did not show the value of the transferred assets and did not rebut other evidence that the assets were transferred in exchange for a debt. *Id.* at 578, 586 S.E.2d at 77–78

42. *Robustelli*, 286 Ga.App. at 821, 650 S.E.2d at 330.

1997 Masters Profit. The Court begins by noting that a description of this claim as being for "profits" is somewhat of a misnomer. The claim is not a claim for profits at all. Rather, it is a claim that Jim took money that belonged to LRMS. "1997 Masters Profit" describes a potential source of allegedly missing cash that LRMS asserts Jim must have taken. The premise of the claim is that LRMS made money and, at the end of the day, it was not in LRMS's coffers, either because Jim diverted it before it got there or because he took it after it did. The claim is nothing more nor less than a claim that Jim took money that belonged to LRMS. As such, it is a conversion claim.[43]

 Conversion of corporate property by a corporate officer is, of course, a breach of fiduciary duty and can be asserted as such.[44] The Court of Appeals affirmed the jury verdict awarding damages against Jim for conversion but affirmed the jury verdict against him for breach of fiduciary duty only as to liability and remanded for determination of damages. The Court must determine whether the verdict on conversion included a resolution of the claim for the 1997 Masters Profit, essentially in Jim's favor.

Based on the evidence presented at trial, the closing arguments, and the jury charge,[45] the Court concludes that the parties tried, and the jury considered, claims for conversion, i.e., the wrongful taking of money, separate and apart from claims for breach of fiduciary duty. When a separate claim for conversion is prosecuted and submitted to the jury, and when the evidence produced at trial focuses on the fiduciary's allegedly improper taking of corporate funds, the verdict on conversion must necessarily include a determination of how much the fiduciary wrongfully took. Consequently, the court concludes that the jury verdict awarded damages for all money that the jury concluded Jim and Sandra had taken from LRMS prior to Jim's resignation.

In this regard, the Court notes, further, that the Court of Appeals specifically referred to evidence that Jim and Sandra had "converted" over $144,000 of LRMS's funds.[46] This Court finds that the only possible source of funds in that amount was revenues from the 1997 Masters. The jury's verdict awarding a lesser sum on the conversion claim necessarily was a determination that Jim and Sandra were not liable in such an amount. The Court of Appeals refused to disturb this verdict at the instance of Jim and Sandra because "it was for the jury to determine how much was converted."[47] The Court of Appeals did not consider a contention of LRMS that the jury verdict for conversion was insufficient because LRMS did not appeal on that ground.

In this Court's judgment, the Court of Appeals' remand for a trial on damages for breach of fiduciary duty did not revive any claims of LRMS against Jim for taking its money. Thus, the ruling of the Court of Appeals affirming the verdict with regard to conversion in all respects while remanding for a new trial on damages for breach of fiduciary duty does not permit LRMS to seek damages for money that Jim improperly took under a theory that the taking of money was a breach of fiduciary duty.

---

43. *See Multimedia Technologies v. Wilding,* 262 Ga.App. 576, 586 S.E.2d 74 (2003).

44. *See Telcom Cost Consulting v. Warren,* 275 Ga.App. 830, 621 S.E.2d 864 (2005).

45. The jury charge is at T. 667–700.

46. *Robustelli,* 286 Ga.App. at 819, 650 S.E.2d at 329.

47. *Id.* at 821, 650 S.E.2d at 330.

The Court concludes, therefore, that the affirmed verdict constitutes a determination that Jim took $12,650.30, no more and no less.

For all of these reasons, the Court concludes that the claim of LRMS that Jim is liable for the 1997 Masters Profit as a separate claim no longer exists. The affirmed judgment based on the jury's verdict on conversion already resolved that claim adversely to LRMS.

### C. The Claims for Breach of Fiduciary Duty

Damages recoverable on the breach of fiduciary duty claim, therefore, must relate to Jim's conduct other than the allegedly improper taking of money that belonged to LRMS. The conduct to which the Court of Appeals referred in this regard was the taking of LRMS's address book and telephone number and copying of the client list.[48] The Court of Appeals did not discuss the damages that might flow from this conduct, and the Court of Appeals did not determine specifically that Jim had or had not usurped corporate opportunities or that, even if he had, he was necessarily liable for damages.

This Court starts the analysis of damages that LRMS may seek based on Jim's breach of fiduciary duty with the proposition that the ruling of the Court of Appeals that Jim had breached his fiduciary duty and its remand for a new trial on damages does not mean that LRMS is entitled to recover damages based on every allegation of breach of fiduciary duty for which it produced evidence at trial. Rather, the State Court on remand, and now this Court, must determine what conduct breached a fiduciary duty and what damages lawfully are recoverable on account of such breaches. This Court then has the additional task of determining whether any such legally cognizable damages are excepted from discharge.

LRMS's primary claim for breach of fiduciary duty (beyond the 1997 Masters Profits claim discussed in Part IV(B) above) is that it is entitled to damages for Future Masters Profits based on Jim's usurpation of corporate opportunities relating to programs for Masters golf tournaments after his resignation. Before considering the Future Masters Profits claim in the next Part IV(D), the Court addresses other potential claims for Jim's breach of fiduciary duty.[49]

**48.** The Court of Appeals did not discuss the fact that the jury charge on misappropriation of trade secrets specifically included an explanation of LRMS's contention that Jim violated the trade secrets act by copying the client list and an instruction that, if such misappropriation had occurred, LRMS would be entitled to damages. T. 682–83. The jury's verdict finding that Jim was liable on this claim, but that LRMS was not entitled to damages, could arguably be a determination that copying the client list produced no damages. This Court's interpretation of the opinion as determining that Jim's copying of the list breached his fiduciary duty, discussed in Part IV(E) below, however, forecloses this argument.

**49.** LRMS may have limited its claims to those for the 1997 Masters Profit and the Future Masters Profits. See Plaintiff's Brief [Docket No. 26] at 17 ("Jim breached his fiduciary duties to LRMS by usurping LRMS' corporate opportunities and defrauding LRMS out of the $202,000 profit from the 1997 Masters."); Plaintiff's Response Brief [Docket No. 29], at 3 ("[T]he issues are whether (and the evidence is perfectly clear that) Jim breached his fiduciary duties by (a) usurping LRMS' corporate opportunities and (b) the improper disposition and acquisition of the $202,000 profit from the 1997 Masters."); Id. at 9 ("The issues before the Court relate to Jim's usurpation of LRMS' corporate opportunities for the 1998 Masters and the unexplained disappearance of the $202,000 profit from the 1997 Masters."); Plaintiff's Reply Brief [Docket No. 31], at 1 ("There are three issues before the Court: (1) whether Jim breached his fiduciary duties by usurping LRMS' corporate

One potential claim for breach of fiduciary duty arises from evidence that, prior to his resignation, Jim instructed clients to make checks payable to him personally for services rendered by LRMS, voided LRMS invoices so that he could profit from the services, and deposited checks from LRMS clients made jointly payable to JIM and LRMS and cash from LRMS clients into his personal account.[50] All of these claims assert that Jim took money belonging to LRMS for his own use. As such, they are claims for conversion and, for reasons discussed in Part IV(B) above, the jury's award of damages for conversion resolved these claims. They no longer exist.

A second, similar potential claim is that, prior to Jim's resignation, he personally provided services to LRMS clients that LRMS was capable of providing and personally collected the payment for such services, thereby depriving LRMS of the profits from that business.[51] The claim for this type of breach of fiduciary duty is a claim for usurpation of corporate opportunities, not conversion, because LRMS never had an interest in the cash or checks that Jim received for services he personally provided.

The evidence is disputed with regard to whether Jim's arrangement with LRMS permitted him to engage in occasional transactions arguably within LRMS's scope of business operations.[52] The Court notes that the Court of Appeals did not discuss this aspect of the breach of fiduciary claim and did not refer to this conduct as supporting the verdict that Jim breached his fiduciary duty. The Court need not determine, however, whether this claim is cognizable on remand. In the context of this family business, the Court finds that the evidence in the record does not support the propositions either that Jim's conduct was fraudulent or that it constituted a willful and malicious injury to LRMS. Consequently, any liability Jim has for these damages is not excepted from discharge under either 11 U.S.C. § 523(a)(2) or (a)(6).

A third potential claim of breach of fiduciary duty is that, in connection with his resignation, Jim failed to disclose, and in fact concealed, critical information relevant to the operation of LRMS's business such as contacts or solicitations he had made on behalf of LRMS with regard to the 1998 Masters program and information relating to sources for badges and rental housing.[53]

opportunities; (2) whether Jim breached his fiduciary duties by appropriating the $202,000 profit from the 1997 Masters; and (3) whether Jim's liability to LRMS is non-dischargeable."). Nevertheless, the complaint arguably includes a request for a determination that claims against Jim as set forth in the opinion of the Court or Appeals are excepted from discharge, and the Scheduling Order states that the Court will make "a *de novo* factual and legal determination of the Debtor's liability to Plaintiff for breach of fiduciary duty, *including* the claim for usurpation of corporate opportunities." Scheduling Order [Docket No. 23], ¶ 5 at 3 (emphasis added). The Court thus appropriately considers Jim's liability with regard to other claims and whether that liability is excepted from discharge.

**50.** Plaintiff's Brief [Docket No. 26–1] at 4. The brief does not quantify these amounts.

**51.** Plaintiff's Brief [Docket No. 26–1], at 4. Exhibit "B" to the brief contains a summary of transactions that LRMS contends reflect checks and cash deposited into Jim's account with regard to business that LRMS could have handled.

**52.** Indeed, at one point Lou testified that he did not think Jim's purchase and resale of Masters tickets with his own money would be wrong. (T. 314).

**53.** Plaintiff's Brief [Docket No. 26] at 6–7.

As discussed above in Part III, the evidence in the record on this point is disputed; Jim claims that he returned all corporate records to Lou and that all of the information was contained in them. (T. 81, 94, 200–03, 210–11, 230–33).

The Court need not resolve this evidentiary dispute because LRMS cannot assert this alleged conduct as a breach of fiduciary duty on account of which it is entitled to damages on remand. The reason is that the allegation that Jim's conduct in this regard breached his fiduciary duty was not submitted to the jury and, therefore, the jury could not find a breach of fiduciary duty based on it. The jury charge instructs the jury that the fiduciary duties of loyalty and good faith that a corporate officer or agent owes to a corporation "prohibit officers and agents from appropriating for themselves the assets, property, and opportunities of the company." [54] The jury charge goes on to discuss some elements of the misappropriation of corporate opportunities, but it says nothing, in the discussion of fiduciary duty or elsewhere, about concealment of or failure to disclose information as being a breach of fiduciary duty. Simply put, the parties did not try the case in the State Court on this theory and the State Court did not submit it to the jury. The jury, therefore, could not have determined that Jim breached his fiduciary duty in this regard, and damages available on remand do not include any damages arising from such conduct.

■ The Court does not think that, in affirming the jury's verdict on liability for breach of fiduciary duty and remanding for a new trial on the issue of damages, the Court of Appeals intended that LRMS could assert additional breaches of fiduciary duty that it did not present at the original trial. Further, the Court of Appeals in its opinion made no mention of any failure to provide any information or its concealment. Consequently, the Court concludes that LRMS cannot assert damages based on failure to disclose information or concealment of it.

The Court notes that the claim for concealment of or failure to turn over corporate information is a different claim than a claim for damages arising from the conduct that the Court of Appeals stated supported the verdict that Jim breached his fiduciary duty: the retention of the telephone number and address book and the copying of the client list.[55] The Court discusses this claim in Part IV(E).

## D. Usurpation of Corporate Opportunities and the Claim for Future Masters Profits

■ LRMS asserts that the business that Jim conducted after his resignation through his new company constituted corporate opportunities of LRMS that he usurped and that he is therefore liable for the profits—referred to as the "Future Masters Profits"—that LRMS would have made from those opportunities. In support of this claim, LRMS argues that it introduced evidence of business Jim's new company did with clients of LRMS with regard to the 1998 Masters program and, in some instances, evidence that Jim had solicited business from these customers prior to his resignation.[56]

---

**54.** T. 673–74.

**55.** The Court of Appeals also stated that Jim's misappropriation of funds supported the verdict for conversion and breach of fiduciary duty. As discussed in Part IV(B), claims for breach of fiduciary duty do not include claims for conversion that the State Court submitted to the jury as a separate claim.

**56.** Plaintiff's Brief [Docket No. 26] at 7–16 summarizes evidence LRMS contends supports these contentions.

Jim asserts that at least two requirements for recovery of damages on a usurpation theory do not exist. The first is that the corporate plaintiff must show the existence of corporate opportunities.[57] The second is that the plaintiff must show that it was capable of and intended to take advantage of those corporate opportunities.[58]

LRMS asserts that the ruling of the Court of Appeals establishes that Jim usurped corporate opportunities and that the only issue on remand is the damages it can recover for that usurpation.

The evidence and the jury charge put this claim before the jury. The charge with regard to usurpation of corporate opportunities contained the following:[59]

If you find that the defendants ... appropriated assets, property, and opportunities of plaintiff [LRMS] for their own benefit, then you shall find that the defendants ... breached their fiduciary duty to plaintiff.

A claim for misappropriation of business opportunities requires that the corporation was able to undertake the opportunity.

If you find that plaintiff could not or did not attempt to undertake the business opportunity it claims the defendant took, then you should return a verdict in favor of the defendants on the allegations that they misappropriated corporate opportunities.

The fact that a company has had dealings with long-standings with [sic] customers, whose sales acted [sic; accounted?] for a large portion of its income does not, in and of itself, create a business opportunity. The opportunity of dealing with certain customers does not constitute a business opportunity. Goodwill is not a corporate opportunity.

The jury was not asked to decide whether Jim usurped corporate opportunities separately from whether he breached other fiduciary duties or to specify damages separately for the various breaches of fiduciary duty that the evidence might support. As discussed in Part IV(A), the Court of Appeals affirmed the jury verdict for breach of fiduciary duty but remanded for a new trial on damages without specifying what breaches of fiduciary Jim had committed for which damages would be recoverable.

Although Jim (and Sandra) in their appeal asserted that LRMS was not entitled to recover on a usurpation of corporate opportunities theory based on the arguments he continues to make here,[60] the Court of Appeals did not address these issues. The Court finds it significant, however, that the Court of Appeals did not refer to the usurpation of corporate opportunities as being evidence that supported the verdict for breach of fiduciary duty. Thus, the opinion of the Court of Appeals is not inconsistent with a determination by the jury that Jim breached his fiduciary duty in some manner other than by usurping corporate opportunities. Indeed, the opinion could be interpreted as a ruling that the breaches of Jim's fiduciary duty are limited to his taking of the company's telephone number and address book and copying of the client list. At the same

57. See, e.g., *United Seal & Rubber Co. v. Bunting*, 248 Ga. 814, 285 S.E.2d 721 (1982); *Singer v. Habif, Arogeti & Wynne, P.C.* 250 Ga. 376, 297 S.E.2d 473 (1982); *Southeast Consultants, Inc. v. McCrary Engineering Corp.* 246 Ga. 503, 273 S.E.2d 112 (1980);

58. *See Looney v. M–Squared, Inc.*, 262 Ga. App. 499, 502–03, 586 S.E.2d 44 (2003).

59. T. at 674–75.

60. Cross–Appellants' Brief [Record Vol. 1, tab 16] at 13–16.

time, however, the fact that the specified conduct supports liability for breach of fiduciary duty does not necessarily mean that other evidence, including evidence of usurpation of corporate opportunities, did not.

Because it is not possible to determine, from a study of the evidence in the record, the charge, and the verdict, whether the jury found that Jim's breach of fiduciary duty included a usurpation of corporate opportunities for which LRMS is entitled to damages, and because the Court of Appeals did not address this issue, the Court concludes that the appropriate course of action for the State Court on remand would necessarily include a determination as to whether Jim usurped a corporate opportunity. In this regard, the Court's judgment is that a jury could not award damages to LRMS without determining the existence of the elements of corporate usurpation. Under the terms of the stipulation of the parties and the Scheduling Order, this Court's responsibility is to decide the facts and law material to these issues based on the evidence in the stipulated record before this Court.

The Court finds that, at the time of Jim's resignation, LRMS did not have any contract with any customer with regard to the 1998 Masters program. Further, the Court finds that no customer of LRMS had any obligation to continue to utilize the services of LRMS with regard to the 1998 Masters program.[61] The fact that LRMS had established business relationships with its customers does not amount to the establishment of a "beachhead" that would make those relationships a corporate opportunity. In this regard, LRMS may well have had an "interest" in keeping its customers or an "expectancy" that customers would continue to use its services in the sense that it anticipated they would. But nothing precluded any competitor from taking a customer away from LRMS by proposing to provide services for less money or by convincing a customer that it could provide better service. The Court concludes, therefore, that LRMS did not have "an interest or expectancy growing out of a preexisting right or relationship"[62] with regard to future Masters programs.

Further, the Court finds that, once Jim announced his resignation, LRMS had no intention of continuing its business, specifically the 1998 Masters program. Jim's testimony that Lou told him he was not continuing the business provides direct evidence on this point. (T. 231–32). Other evidence supports this finding.

Assuming, arguendo, that Jim had not turned over all the information relating to the 1998 Masters program that would have been necessary for LRMS to maximize its 1998 Masters business, it is clear that he did turn over a lot of information and that much of it would have contained useful information about the Masters program business. Moreover, Lou regularly attended the Masters tournament, although he apparently had few responsibilities, so he must have had some information and experience with regard to customers and contact persons. Yet the record contains no evidence that LRMS did anything to attempt to continue doing business or to operate a Masters Program in 1998 after Jim's resignation.

The Court notes that Lou testified that, if he had had the telephone number and customer information, he could have continued the business. (T. 290–93). Per-

---

61. See *Singer v. Habif, Arogeti & Wynne, P.C.,* 250 Ga. 376, 297 S.E.2d 473 (1982).

62. *Southeast Consultants, Inc. v. McCrary Engineering Corp.,* 246 Ga. 503, 508, 273 S.E.2d 112 (1980).

haps he could have. Nevertheless, the Court also notes that, despite Lou's efforts with regard to obtaining corporate records and information, there is no evidence whatsoever that he ever took a single step toward having telephone calls forwarded to him in Connecticut.[63] Surely a person intending to continue a sales business would immediately take action to insure that customers and suppliers calling LRMS would reach him rather than Jim. Yet nothing indicates that he asked Jim to have calls forwarded or contacted the telephone company to have calls to the company number forwarded to him. Thus, whether or not Lou *could* have continued the business, he did not *intend* to do so.

Finally, the Court finds persuasive the testimony of Lou's wife, who stated that if Jim had gone to work for General Motors, the company would have just closed up. (T. 364). This statement of intent is thoroughly consistent with the lifestyle and living arrangements that Lou and his wife had. At the time of Jim's resignation, they split their time between Connecticut and California, and spent little or no time devoted to the business. Nothing indicates they had any desire to change their routine by undertaking the full-time job of running LRMS's business.

The Court thus finds from the evidence that Lou did not intend to run the 1998 Masters program, or any other business operations, himself or to employ anyone else to do so. The Court finds, therefore, that LRMS did not attempt to pursue any opportunities that it may have had. Without someone to continue the solicitation of its existing customers and to make the arrangements necessary to provide ser-

vices (i.e., badges, rental housing, transportation, and so forth), LRMS did not have the capacity to undertake any business opportunity that Jim may have taken.

For all of these reasons, the Court concludes that LRMS does not have a claim against Jim for usurpation of corporate opportunities.

### E. Breach of Fiduciary Duty Based Retention of Telephone Number and Address Book and Copying of Client List

The jury found that Jim breached his fiduciary duties, and the Court of Appeals in affirming Jim's liability in this regard ruled that evidence that Jim misappropriated funds, retained the company's telephone number and address book, and copied its client list supported this verdict, as well as the verdict of liability for conversion. As discussed earlier in Part IV(A), the Court has concluded that the jury determined Jim's liability with regard to damages for misappropriation of the company's money in connection with its determination of damages for conversion. And as discussed in Part IV(C), the Court has concluded that LRMS has no claims against Jim for breach of fiduciary duty for conduct prior to his resignation that are excepted from discharge.

This leaves for consideration a claim of LRMS for damages for Jim's breach of fiduciary duty in retaining the telephone number and address book and copying the client list.[64]

A potential claim for damages is that LRMS lost potential business and profits

---

63. Whether Jim's use of the company telephone number in connection with his new business breached his fiduciary duties is a separate legal issue from the factual inference relating to Lou's intent to continue LRMS's business that arises from the fact that he did

nothing to attempt to receive calls on which that business depended.

64. The Court appropriately considers this claim for reasons set forth in footnote 49.

because of the diversion of customer calls to Jim and his new company and because Jim's company, with ready access to the information in the address book and copied client list, could immediately solicit business and did not have to develop its own contacts with customers and sources for program requirements such as badges and rental housing. An essential element of such damages, however, must be that LRMS could have obtained business that Jim's company took and that, if it did, it could have performed. As discussed in Part IV(D) in the context of the claim for usurpation of corporate opportunities, the Court has determined that LRMS cannot establish this element. Consequently, it has no claim for damages on this theory.

Although LRMS thus has no claim for damages based on lost business or profits, it does have a claim for damages based on the value of the telephone number and the information in the address book and client list that Jim and his new company acquired. Arguably, the telephone number and the information had no value to LRMS because it was not conducting business. Nevertheless, these assets did have value to Jim and his new company or to anyone else who might have been willing to purchase him from LRMS. Jim was, of course, entitled to take with him the information that he had acquired during his employment with LRMS and use it to solicit business, and it is quite conceivable that, even without the address book and the copy of the client list, he could have, with some effort and time, gathered much if not all of the information through research based on his memory and personal information he could lawfully retain. The convenient compilation of the information was obviously advantageous to Jim and, as such, had value.

The Court concludes that, at the new trial on damages that the Court of Appeals ordered, LRMS is entitled to recover damages based on the value of Jim's retention of the telephone number and the address book and the copying of the client list. The Court considers in Part IV(G) whether this claim is excepted from discharge under § 523(a)(2) or § 523(a)(6).

### F. Claims for Punitive Damages and Attorney's Fees

■ Based on the Court's review of the stipulated record and its analysis of LRMS's claims as set forth above, the Court finds that Jim's conduct did not show willful misconduct, malice, fraud, wantonness, oppression, or an entire want of care that would raise a presumption of conscious indifference to consequences that would justify punitive damages. Consequently, the Court concludes that LRMS does not have a claim against Jim for punitive damages.

■ Based on the Court's review of the stipulated record and its analysis of LRMS's claims as set forth above, the Court finds that LRMS has not proved that Jim acted in bad faith, was stubbornly litigious, or caused LRMS unnecessary trouble and expense. Consequently, the Court concludes that LRMS does not have a claim against Jim for attorney fees.

With regard to both of these issues, the Court finds that the evidence shows *bona fide* disputes with regard to LRMS's claims for conversion on which the jury found Jim liable, the possible claim for breach of fiduciary duty that the Court has found to be dischargeable, and the claims for breach of fiduciary duty that remain viable. With regard to the claims on which the jury and the Court of Appeals found that Jim had no liability, and with regard to the claims that this Court has determined are no longer viable, Jim obviously could have no liability for punitive damages or attorney's fees.

**G. Dischargeability of claim for breach of fiduciary duty based on retention of telephone number and address book and Copying of client list**

The Court must determine whether the claim for breach of fiduciary duty based on retention of the telephone number and address book and copying of the client list (discussed in Part IV(E)) is excepted from discharge under either 11 U.S.C. § 523(a)(2) or (a)(6).

With regard to the dischargeability issues, the Court finds the following facts based on the evidence in the record. By virtue of his long relationship with LRMS, Jim had access to the information in the address book and the client list and, as such, had to know at least some of the information in them. At the time of his resignation, Jim offered to purchase the tangible assets of LRMS, but he did not propose to pay anything for the use of the telephone number or the information in the address book and client list. (Exhibit 307; T. 208–09).

LRMS asserts that Jim refused to provide information about the 1998 Masters program to Lou and purposefully kept this information from Lou in order to enrich himself at LRMS's expense.[65] In this regard, LRMS points to the "Status Memo" that did not disclose anything about the 1998 Masters. (Exhibit 307; T. 208–09, 230). For his part, Jim testified that he transmitted all corporate records to Lou and that the information he transmitted included all the information that Lou had requested.[66] Moreover, Jim testified that Lou told him he was closing the business (T. 231–32), and his belief that Lou did not intend to continue the business was well-founded for the reasons the Court has discussed in Part IV(D) in so finding.

As the Court has described LRMS's remaining claim for breach of fiduciary duty, LRMS's claim for damages is based on the values of the compilation of information in the address book and the value of the use of the telephone number. The fact that Jim may have deprived LRMS of the use of the information or the telephone number did not cause damage to LRMS because, as the Court explained in Parts IV(D) and (E), LRMS had no use for the information or telephone number because it did not intend to conduct any business that would require its use. Rather, the value to LRMS of the telephone number and compilation of information could only be based on its value to Jim or another person in the same business, *i.e.*, what Jim or someone else would have paid for the use of the telephone number or the compilations.

So the injury that Jim's conduct caused was LRMS's loss of its ability to realize value from assets to which it had exclusive rights. The Court must determine whether this conduct was fraudulent within the meaning of § 523(a)(2) or whether it constituted a "willful and malicious" injury to LRMS's property within the meaning of § 523(a)(6).

*§ 523(a)(2)—Fraud*

To establish an exception to discharge for a debt based on fraud under § 523(a)(2), a creditor must ordinarily establish that (1) the debtor made a false representation; (2) the creditor relied on the representation; (3) the reliance was justified; and (4) the creditor sustained a loss as a result of the misrepresentation. *E.g., Securities and Exchange Commission v. Bilzerian (In re Bilzerian)*, 153 F.3d 1278, 1281 (11th Cir.1998).

---

**65.** Plaintiff's Brief [Docket No. 26] at 7.

**66.** See discussion in Part III.

■ Jim did not make any false or misleading representations with regard to the items in question, nor did he deceive or intend to deceive LRMS about them. Thus, two of the usual elements required for exception of a debt based on fraud under § 523(a)(2) are not present. The Court finds nothing fraudulent about Jim's conduct within the meaning of § 523(a)(2). Consequently, the Court concludes that LRMS's claims for breach of fiduciary duty are not excepted from discharge under that section.

In some circumstances, an actual fraud claim under § 523(a)(2) may exist even if false representations do not occur,[67] but such circumstances are not present here.

*§ 523(a)(6)—Willful and malicious injury*

Section 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." Jim's breach of fiduciary duties in retaining the telephone number and address book and in copying the client list caused injury to LRMS's property, as discussed above. Whether his debt for the damages he caused is excepted from discharge thus depends on whether his conduct was "willful and malicious."

■ The Supreme Court addressed the question of a "willful" injury in *Kawaauhau v. Geiger*, 523 U.S. 57, 61–62, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998):

The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or,

Congress might have selected an additional word or words, *i.e.,* "reckless" or "negligent" to modify injury. Moreover, … the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the *consequences* of an act," not simply "the act itself." Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964) (emphasis added).

■ To be "malicious" within the meaning of § 523(a)(6), the conduct must be "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will." *Hope v. Walker (In re Walker),* 48 F.3d 1161,1164 (11th Cir.1995) (citations omitted). *See also Digital Commerce, Ltd. v. Sullivan (In re Sullivan),* 305 B.R. 809, 823 (Bankr. W.D.Mich.2004) ("Malicious" means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent.); *Tusco Budget Outlet, Inc. v. Stustman (In re Stutsman),* 163 B.R. 374, 376 (Bankr.N.D.Okla.1993) (Malice is ordinarily inferred if the debtor "willfully disregarded the rights of a creditor, if the debtor possesses actual knowledge, or if it is reasonably foreseeable, that his conduct will result in injury to the creditor.").

The court in *Britt's Home Furnishing, Inc. v. Hollowell (In re Hollowell),* 242 B.R. 541, 546 (Bankr.N.D.Ga.1999) explained the relationship between the "willful" and "malicious" elements of the § 523(a)(6) exception this way:

The consensus among courts addressing the issue since the entry of the *Geiger* opinion appears to be that a willful injury under § 523(a)(6) may be shown by proof of the debtor's subjective motive

---

67. See, e.g., *McClellan v. Cantrell,* 217 F.3d 890 (7th Cir.2000).

to cause injury or by an objective substantial certainty that the conduct would cause injury. Whether or not the term "malicious" has been subsumed in the *Geiger* standard or retains meaning separate from "willful," the concept that justification or excuse could negate a debtor's intent to injure appears to have been integrated into § 523(a)(6).

In applying these principles to the facts here, the Court begins by noting that the evidence does not establish a subjective intent on Jim's part to injure LRMS. Jim's testimony establishes that he thought that LRMS had no use for the telephone number or the information compiled in the address book and client list because LRMS was not going to conduct any business. His conclusion in this regard was objectively reasonable and, as the Court has found, correct.

Jim did, however, proceed to make use of these corporate assets without offering to pay compensation to LRMS. The use of another's asset without paying for it under any set of circumstances will cause injury to the other party. The Court concludes, therefore, that, without regard to his subjective state of mind, Jim's conduct viewed under an objective standard would, with substantial certainty, cause injury. In this sense, his conduct was "willful" within the meaning of § 523(a)(6).

Section 523(a)(6), however, requires that the conduct causing injury be both intentional and malicious. With regard to the use of the telephone number, the Court notes that the telephone number rang in Jim's basement, and there is no evidence that LRMS ever requested that Jim discontinue its use or directed that calls be forwarded. It does not appear that use of the telephone was an issue at the time of

or immediately following Jim's resignation.[68] When coupled with Jim's subjective conclusion that LRMS was not going to conduct business (such that the telephone line would be of no benefit to LRMS as a matter of ongoing business), it is arguable that Jim has shown a substantial excuse for continuing to use the telephone number.

With regard to Jim's use of the information compiled in the address book and in the client list, it is clear that these compilations resulted exclusively from Jim's efforts over the years that he, and he alone, had run and managed LRMS's business. The business of both LRMS and Jim's new company was to provide a service. Jim's contacts and relationships provided the basis for LRMS to acquire customers and to deliver the programs they wanted. His resignation did not change the existence of the contacts and relationships. He was free to use them for his own account.

The Court finds, again in view of the reality that LRMS was not going to continue the business, that Jim could reasonably have thought that he could properly retain compilations of information that he had made and that he did not consider those compilations to be the exclusive property of LRMS. In this regard, the Court finds that his offer to purchase the equipment of LRMS demonstrates a respect for the property rights of LRMS and that his retention of the compilations was a misjudgment of the fact that the compilations were also property of LRMS that he had no right to use. His motive in retaining the compilations could not have been to hinder competition from LRMS, because it was clear that LRMS would not be in business.

---

**68.** For example, in his letter of November 10, 1997 (Exhibit 312), Lou requested documents and discussed other matters, cautioned Jim about soliciting former clients of LRMS but made no request with regard to the company's telephone number.

Nevertheless, conduct is "malicious" if it is "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will." *Hope v. Walker (In re Walker),* 48 F.3d 1161, 1164 (11th Cir.1995) (citations omitted). Jim's conduct has been determined to be wrongful. Jim's fiduciary duties of loyalty and good faith made it incumbent on him to take care to protect the interests of LRMS with regard to all of its property under his control. Without regard to Jim's subjective state of mind, the wrongful, unauthorized use of LRMS's telephone number, address book, and client list violated this duty.

Jim obtained the benefit of property belonging to LRMS without its permission and without paying for it. He had a duty not to do that. His mere failure to recognize and carry out that duty does not constitute cause to justify or excuse his conduct. It is, therefore, malicious within the meaning of § 523(a)(6).

Consequently, the Court concludes that Jim's breach of fiduciary duties in retaining the telephone number and address book and in copying the client list constituted a willful and malicious injury to the property of LRMS and that its claim for damages, as described above, is excepted from discharge under § 523(a)(6).

## V. Summary of Conclusions of Law

The Court summarizes its conclusions of law as follows:

1. LRMS does not have a claim for damages based on the 1997 Masters Profit because it is a claim for conversion that the verdict and judgment in the State Court determining Jim's liability for conversion resolved.

2. LRMS does not have any claims for damages based on allegations that Jim took money belonging to LRMS or diverted money owed to LRMS for his personal benefit because any such claims are claims for conversion that the verdict and judgment in the State Court determining Jim's liability for conversion resolved.

3. Any claim that LRMS may have against Jim for usurpation of corporate opportunities that arose prior to his resignation, other than claims with regard to the Future Masters Profit addressed below, is not excepted from discharge under 11 U.S.C. § 523(a)(2) or § 523(a)(6).

4. LRMS does not have any claim against Jim for damages for breach of fiduciary duty based on allegations that Jim concealed or failed to disclose information to LRMS.

5. LRMS does not have a claim against Jim for damages based on Future Masters Profits, or based on Jim's usurpation of corporate opportunities in connection with his resignation, because either: (1) no corporate opportunity existed that Jim could have usurped; or (2) LRMS was not deprived of any business or profits because it did not intend to continue its business after Jim resigned.

6. Jim breached his fiduciary duty by retaining LRMS's telephone number for use in his new business, by retaining LRMS's address book, and by copying LRMS's client list. LRMS has a claim for damages for the value of the telephone number and address book that Jim took and the value of the client list that he copied. LRMS does not have a claim for Future Masters Profits arising out of this breach of fiduciary duty. This claim is not excepted from discharge under 11 U.S.C. § 523(a)(2). This claim is excepted from discharge pursuant to 11 U.S.C. § 523(a)(6). In accordance with the stipulation of the parties and the Scheduling Order, LRMS may proceed to prove its damages in the State Court of Fulton County.

7. LRMS does not have a claim for attorney's fees or punitive damages.

8. For reasons set forth in the Amended Summary Judgment Order, no claims of LRMS against Jim are excepted from discharge pursuant to 11 U.S.C. § 523(a)(4).

## VI. Conclusion

For reason set forth above and in the Amended Summary Judgment Order, and in accordance therewith, the Court will enter judgment determining:

(1) that the only claim that LRMS has against Jim that is excepted from discharge under 11 U.S.C. § 523(a)(6) is its claim for damages for the value of the telephone number and address book that Jim took and the value of the client list that he copied based on Jim's breach of his fiduciary duty;

(2) that LRMS's claims against Jim for any other breach of fiduciary duty either do not exist or are not excepted from discharge under 11 U.S.C. § 523(a)(2), (4), or (6); and

(3) that LRMS does not have any other claims against Jim that are excepted from discharge under 11 U.S.C. § 523(a)(2), (4) or (6).

The Court dismisses Jim's Motion to Compel [Docket No. 33] as moot.